**ANALYSIS OF THE PRESENTENCE INVESTIGATION REPORT**

USA V. MARTIN, CR. NO. 04-00322-01 DAE
CR. NO. 05-00049-01 DAE
November 2005, Hawaii

The following is an analysis of the PSR in the above criminal case(s), from the defendant, based on true facts and events. The defendant understands that the U.S. Probation Office prepared this PSR based on the information provided by the U.S. Prosecutor, which could be derived from untrue, slanderous and distorted facts and/or statements, especially from Hung Chi LUU, an FBI informant. Hence, only the paragraphs containing incorrect and/or distorted facts will be discussed.

To avoid repetitious comments regarding Luu, and his statements as "lies", or "distorted", or "slanderous", defendant will simply say **"untrue"**, and here is a simple proof: In the search warrant signed by Magistrate Judge Kevin Chang, obtained by USSS special agent Joseph Roberts on February 15, 2003, paragraph (5)(a) states that Luu had known Martin since 1997. In the PSR, paragraph 61 page 18 states that Luu met Martin around November 2000. It is clear here that Luu is just a "sheer" liar. The fact is that Martin was introduced to Luu at the end of August 2001, by a fellow named Hue, who took Martin and another friend to Luu's apartment 503-C at 773 Kinau Street, Honolulu, Hawaii.

Also, since the U.S. Prosecutor did not give defendant adequate time for plea bargaining and clearly gave the impression that defendant had to plead guilty to all counts as prepared by him, or else face another indictment (Two times defendant did not plead guilty to "wire fraud" charges (all Luu's) and the hearings were called off), defendant will comment on those counts which are ambiguous and which should require evidentiary hearing, without denying his guilty plea thereof. Defendant already showed good faith by taking his responsibility as demonstrated.

Paragraph 19, Count 44: Luu gave Martin this access device check in the amount of $9,400.00 and it was Martin and Martin alone, who deposited it into FHB. Anna Martin never saw the check, did not know anything about the check. David Sage of FHB fabricated the evidence to harm Anna Martin, and he was fired from his job around September 2004.

Paragraph 41, Count 10: Untrue and distorted, since Anna Martin was neither an owner of Tan Tien Video (Thu Do was, defendant had the space lease with Landlord) nor performing the tape copying herself. She had no interest or gain in any proceeds from the tape rental at all. Anna Martin does not know English and does not understand the law and does require a licenced interpreter in case of interview, to be proper and to have merit, otherwise her statements must be suppressed. Martin lost approximately $200,000.00 helping Thu Do maintain the business for 2 years.

- 1 -

EXHIBIT "D"

Analysis of the PSR
page 2

Paragraph 51a: Anna Martin's restitution includes $16,455.62 owed
    to Chase Manhattan Bank, which same amount was repeated in
    paragraph 196 as restitution for defendant. This amount is
    repetitious twice. Since defendant committed the offense, NOT
    Anna Martin, this amount should be deducted from Anna Martin's
    total restitution amount of $29,745.62.
Paragraph 55: untrue. Luu had so many criminals who flocked to his
    apartment(s) daily, bringing him stolen items as stated.
Paragraph 56: untrue. Strictly Luu's expertise, as confirmed by
    banks, computer companies if records are subpoenaed.
Paragraph 57: untrue. All Luu's.
Paragraph 59: Luu asked defendant for a ride to Kanneohe and defendant
    was taking a nap in the truck when Luu came back and asked
    Martin to drive away. Martin thought that Luu was doing something
    for the FBI, which Luu claimed provided "umbrella protection"
    for both him and Martin.
Paragraph 60: Since Luu was an FBI informant, Martin chose not to
    talk to protect him, did not know that Luu stabbed him in the
    back instead, with all kinds of lies.
Paragraph 61: untrue. Luu was the king of credit card/wire fraud.
Paragraph 62: untrue. Luu received stolen information from criminals
    such as Dung lun (short Dung) who lived in the Palolo Housing,
    and who was a burglar/car banger. Luu used others' addresses
    for delivery of fraudulent merchandise, which Linda Thompson,
    his girl friend, had shown up to pick up first.
Paragraph 63: untrue.
Paragraph 64: untrue. Martin was introduced to Luu end of August
    2001. Early September 2001, Luu was arrested at Comp USA, Ala
    Moana Boulevard for using a fradulent credit card (which he
    had obtained many weeks earlier via internet) and was detained at
    OCCC. HPD also charged him with bank fraud (FHB ?) under the
    cover of "Speedy Painting" ?).
Paragraph 65: untrue.
Paragraph 66: untrue.
Paragraph 67: untrue.
Paragraph 68: untrue. Anna Martin had nothing to do with Luu. She
    would never associate  with this type of evil people.
Paragraph 70: untrue.
Paragraph 72: All Luu's, as confirmed by credit reports.
Paragraph 73: All Luu's. Some ordered items were sent to Tan Tien
    Video to harm Martin.
Paragraph 74: untrue. Both Comp USA and Personal Touch Computer knew
    Luu always used fraudulent credit cards to buy merchandise,
    with his name on the card as authorized buyer.
Paragraph 75: the search warrant was obtained based on Luu's lies,
    slanderous statements and no credit whatsoever, certainly NOT
    beyond reasonable doubt at all. Furthermore, the USSS failed
    to provide "Execution and Return" on the seized items. Martin
    certainly did not have any fruits of crime stored in his CPU's,
    since he would not do wire fraud at all. Failure to provide
    "Execution and Return" shortly after seizure is a vioaltion of
    the LAW.

Analysis of the PSR
page 3

Paragraph 76: Hebert should have been provided with MIRANDA'S RIGHTS. It was an overstatement that Hebert implicated anything, since Martin hardly saw him at home, due to different work schedules.
Paragraph 78: Count 9: it was a legitimate transaction.
            Count 12: needs evidentiary hearing
            Count 13:   - " -   - " -    - " -
            Count 29: money never released, account frozen.
            Count 32: needs evidentiary hearing.
            Count 42: check reversed, no credit.
            Count 44: defendant and defendant only did this.
            Count 59: check reversed/bounced. No credit.
            Count 68: check backcharged. Martin was called up by FHB and paid $330.96 in cash instead.
Paragraph 79: Count 11: questionable. Needs evidentiary hearing.
            Count 16: questionable. Needs evidentiary hearing.
            Count 17: questionable. Needs evidentiary hearing.
            Count 48: Check was reversed. No credit.
            Count 56: questionable. No credit for this check.
            Count 57: check was reversed. No credit.
            Count 71: check was reversed. No credit.
Paragraph 80: amount questionable and all items need evidentiary hearing.
Paragraph 81: untrue. All Luu's crimes.
Paragraph 82: money was frozen by bank. No credit.
Paragraph 83: ambiguous. Needs evidentiary hearing.
Paragraph 85: Luu asked Martin to take him to Costco and gave Martin a credit to keep since his short did not have pockets. Investigation should well show that the card belonged to Luu, through internet. FBI agent Sam Mum knew about this. The 2 items were put in Martin's pockets and he was caught as stealing, since Luu's short did not have pockets.
Paragraph 86: the credit cards belonged to Luu (credit reports should well confirm this) who asked Martin to pull out some cash for him to pay his rent.
Paragraph 87: the credit card belonged to Luu, who asked Martin to buy gold for him. Credit reports/investigation confirm this fact.
Paragraph 91: check was reversed. No credit.
Paragraph 92: check was not good, no credit.
Paragraph 92a: This was a fabrication of evidence to harm Anna Martin, who never saw the check, did not know nothing about the check, and was NOT at FHB/Kahala Branch as slanderously accused. It was Martin (Abraham) who did this. There was only ONE check, ONE deposit, and ONE person involved here.
Paragraph 93: Defendant admits this to be true.
Paragraph 95: Martin did pay for this car with his money, including the $330.96 which he paid in cash after the check was reversed by FHB.
Paragraph 96: the government would not return the vehicles to Martin, and caused these to be forfeited by Martin.
Paragraph 97: needs evidentiary hearing.
Paragraph 98: needs evidentiary hearing.

Analysis of the PSR
page 4

Paragraph 99: needs evidentiary hearing.
Paragraph 100: needs evidentiary hearing.
Paragraph 101: needs evidentiary hearing.
Paragraph 102: the FBI entered Martin's residence on 2/15/2003, and occupied it for 2 days, chasing all residents out, who had to seek lodging at a Waikiki hotel at their expense (not 2/16/03 as mentioned on line 3 of this paragraph) The FBI took more than whatever mentioned, since nobody was around to watch the agents take whatever they wanted to take, way beyond the list of items to be searched for and seized as authorized by Magistrate Judge Kevin Chang on 2/15/2003. The FBI took mostly the original tapes, stored in Martin's living room and one bedroom. <u>The number of copied (bootleg) tapes was only about 150 copies</u>, <u>plus 120 brand new BLANK tapes</u> in the rear garden.
Paragraph 104: Since Anna Martin is basically a country woman, does not know English. FBI agents failed to cite Miranda's Rights, since Anna Martin does need a licensed interpreter and a lawyer, so that the interview was appropriate, legal; otherwise Anna Martin's statements must be suppressed. "Thi Thu Do <u>owned</u> Tan Tien Video" is hereby admitted by defendant. Therefore the government concurs the fact that Anna Martin is NOT owner of Tan Tien Video, legally or whatnot. Defendant was the lease holder/owner of the commercial space.
Paragraph 105: Anna Martin's statement must be suppressed, due to FBI's failure to provide her with Miranda's Rights, interpreter and lawyer. As a matter of fact, there was NO lease agreement with Tai Seng, Asia View or Vietnam International at all. The implicit agreement, as with previous owners of the same store, Viet's Mart, Vina Video (2 owners using the same name), was that they could duplicate the tapes for rent only, and this has been through with ALL the Chinese-Vietnamese video-renting stores across the antion. Defendant DOES NOT have a copy of the said lease agreement.
Paragraph 106: Anna Martin's statement must be suppressed, since the FBI agents did not follow the judicial procedure.
Paragraph 107: Thu Do's statement must be suppressed, since the FBI did not cite Miranda's Rights, and provide a licensed interpreter and a lawyer.
Paragraph 108: needs evidentiary hearing. Tai Seng and Asia View SOLD VHS tapes to Tan Tien Video, NOT leased, the way it was. Allan Hule should have known that all stores in this country make duplicates for rent, at their stores ONLY of course. And that is WHY and HOW the stores are willing to pay dearly for the tapes.
Paragraph 109: untrue. The videotapes were sold to Tan Tien Video and there is no return of tapes as mentioned.
Paragraph 111: untrue. Defendant's cost to make a duplicate copy of the videotape was about $2.00, and the rental fee was less than $1.00 per tape. Tan Tien Video DID NOT sell any copied tapes, to avoid conflict with agreement with the companies, strictly RENTAL. No customer would pay more than $1.00 for these copied tapes, since they will be recycled anyway, and the customers are well aware of this fact.

- 4 -

Analysis of the PSR
page 5

Paragraph 112: untrue. As stated earlier, defendant followed precedents in copying the tapes, as per implied agreement with Tai Seng, Asia View and Vietnam International which clearly knew that all stores do copy tapes, since only a copy of the tapes was sent to us or ordered, with us paying a high surplus fees on top of the regular cost per tape. It is noted here that defendant suffered a loss of approximately $3,000.00 per month, labor and other costs included. Defendant later found out that Thu Do, owner of the Tan Tien Video, was the only person benefitting from running the store, since all losses were borne by Martin.

Paragraph 114: The amount of $16,455.62 was cited in paragraph 51a as part of Anna Martin's restitution. This is clearly an error and should be corrected, the amount should be deducted from Anna Martin's restitution since it was defendant who committed the offense, and therefore this amount belongs to defendant.

Paragraph 115: The victims certainly did not know about Luu, the grand master criminal behind all these criminal acts.

Paragraph 116: questionable, since defendant did not have any lease with these companies, and furtheremore, only about 150 copied tapes, ready to be recycled, were at Martin's residence, on both 02/15 and 16, 2003. Furthermore, the copied tapes cost only $2.00 each.

Paragraph 118a: defendant did keep his promise and provided the US Probation Office with some information on Luu.

Paragraph 119: the court failed to observe the Booker issue on sentencing date of December 5, 2005, clearly a violation of the Sixth Amendment of the United States Constitution. The court did not announce the right to appeal the imposed sentence, and defendant's counsel did not object, being totally ineffecgive.

Paragraph 123: The total apparent loss is $164,825.73 is NOT the **ACTUAL loss**. The **ACTUAL loss** is $164,825.73 minus the amount of all the checks either bounced, reversed or no credit (counts 9, 29, 42, 57, 58, 59, 68 and 71 totalling $54,670.13, OR **$110.155.60** only. Defendant cannot imagine any figure higher than that, and if an evidentiary hearing is conducted, probably a lesser figure will be realized, since defendant knew quite well that defendant did not acquire much money from Luu's entrapment scheme. Defendant would object to additional losses set forth in paragraphs 80-93, in the amount of $63,338, without an evidentiary hearing or found to be true beyond reasonable doubt by a jury. Defendant already pled "NOT" guilty twice to the wire fraud charges, which were strictly done by Luu. The law of lenity should favor defendant in this instance.

Paragraph 124: untrue. The figures provided by the FBI are unreliable, since defendant knew exactly what he was doing. The FBI agents couldn't even distinguish the difference between original tapes and copied tapes, and took most of defendant's original tapes (kept by defendant for records) from his home. Therefore, the figure of 1,329 videotapes is incorrect, and the price tag of $10 per tape is super high. No customer would pay more than $1.00 per copied tape at all.

Analysis of the PSR
page 6

Paragraph 126: defedant hereby incorporates all analysis comments
  on paragraph 1 througn 125 and provides the following:
  a) Base Offense Level ..............................:   6
  b) **Actual loss** of $110,155.60 (more than $70,000.00 .: + 8
  c) more than 10 victims, less than 50 ............. : + 2
  d) defendant objects to USSG § 2B1.1(b)(C), offense
     involving sophisticated means (all Luu's) ...... :   0
                                                       --------
                        Base offense level: ............:  16
Paragraph 127: even needs evidentiary hearing but
  defendant raises no objecttion ...................: + 2
                                                       --------
Paragraph 131: revised Adjusted Offense Level (Subtotal):  18
Paragraph 144: ..........................................:  18
Paragraph 147:  **Total Offense Level (final)** .............:  15
  So the **final total offense level is 15**
Paragraph 149: **TOTAL OFFENSE LEVEL:** ....................:  15
  (the final offense level is obtained by deducting
   3 from 18, 3 being credits)
Paragraph 152: defendant took his responsibility, and in a Viet-
  namese family, the husband has all the power to decide for the
  family business, and the court agreed to this fact. Defendant
  did the tax invasion all by himself, therefore only himself
  should be punished. Defendant recalls a total tax loss of
  $97,000 something, NOT $99,678 as stated, but he could be wrong,
  without old records to verify.
Paragraph 154: the date is June 9, 2009. Evidentiary hearing is
  needed to affirm all charged offenses before this date. Luu
  started entrapping defendant with checks later than this date.
Paragraph 155: depends on outcome of paragraph 154.
Paragraph 158: untrue. A family member of the the credit card holder
  begged defendant to use the card so that he could have increased
  credit and cash to travel to Vietnam. Therefore it was an
  authorized use of the credit card, but defendant was set up,
  and went ahead to pay the bills, taking a loss to clear the mess.
Paragraph 159: defendant came to Hawaii on an East-West Center
  scholarship to study civil engineering, and upon graduation, he
  would return to Vietnam to help the country.
Paragraph 160: defendant did not migrate to Hawaii, he was awarded
  a scholarship to study civil engineering at the Univeristy of Hawaii.
Paragraph 166: defendant's father and grand father were "heavy" on
  drinking, and so is defendant. Defendant had been drinking a lot,
  strong beer, wine as well as cognac. Defendant used to be drunk
  before coming home, practically everyday, being a construction
  man. He could consume as much as 8 bottles of wine by himself,
  or a case of Heinekin and a bottle of wine or cognac. Before
  coming to Lompoc, defendant drank at least 2 bottles of cognac
  and 3 bottles of wine, trying to forget the injutice and unfairness
  which had destroyed his family, due to ineffective assistance of
  counsel. Defendant can drink many people under the table.
Paragraph 173: defendant had suffered tremendous losses: some $200,000
  for Tan Tien Video, $10,000 on the Subaru, $35,000 on the Mercedes,

Analysis of the PSR
page 7

$5,000 on the computers and other electronics equipment. Defendant obtained approximately $80,000, certainly NOT $228,000 as stated, from the alleged offenses, and he had to split with Luu half of this amount. In March 2003, defendant traveled to Vietnam with only $2,100 in his pocket, surviving 2 months there. Defendant came back to Hawaii in early May 2003 to take care of his sick wife. Luu used this money to take care of his mother's gambling debts. Luu, heartless person, used his mother's name (Scalone) fraudulently to obtain phone service and pay the bills with stolen check information via internet at night, from 773 Kinau Street, Apartment 503-C.

Paragraph 178: If the PSR is corrected to show a total offense level of 15 and a criminal history of II, the guideline range for imprisonment is 21 to 27 months. With a criminal history III, it will be 24 to 30 months. Defendant was only secondary in all alleged offenses charged, with Luu being the grand master criminal as demonstrated.

Paragraph 196: the amount $16,455.62 is repeated here for the defendant, since this amount is also part of Anna Martin's restitution, as stated in paragraph 51a. This amount should therefore be deleted from Anna Martin's restitution total amount, since defendant committed the offense, NOT Anna Amartin.

Paragraph 196: a) aggravating factors: Luu was the grand master criminal behind all the alleged offenses, as already demonstrated.
     b) mitigating factos: defendant had been helping the government as stated in his Third Ground for Relief in Motion 2255, and is always ready and willing to assist the government with crime fighting. Defendant will try his best, upon release, to work hard to earn money to pay both fines and restitution as ordered by the court,

Addendum to the PSR, page 1A:
Objection to fourth paragraph, since it was count 44, already taken into account. Furthermore, the government also charged Anna Martin with this same count, with FHB fabrication of evidence, since Anna Martin never went to FHB that day (defense of alibi), defendant did.

### FINAL REMARKS

As stated at the beginning of the analysis, defendant is being truthful to provide true and reliable information in his analysis of the PSR, since the court should know the truth in order to provide **fairness and justice** to all convicted criminals. **Defendant is NOT denying any of the already pled guilty counts at all,** he is doing this sort-like "GUILTY WITH EXPLANATION", to clarify and provide the defense and/or other source of information for optimum determination of the offenses, inforamtion and/or statements, and to have corrections made on the errors in his PSR.

DATED in Lompoc, California   24   January 2007

*[signature]*

_____
Abraham Martin
Defendant

- 7 -