IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | CV. NO. 06-00629 DAE LEK |
| | CR. NO. 04-00322 DAE |
| | CR. NO. 05-00049 DAE |
| Respondent/Plaintiff, | |
| | DECLARATION OF MICHAEL A. WEIGHT |
| v. | |
| ABRAHAM NGUYEN MARTIN, | |
| Petitioner/Defendant. | |

I, MICHAEL A. WEIGHT, declare:

    1.   I have been licensed to practice law in the State of Hawaii since November 1967 and my practice concentrated on criminal defense in both State and Federal courts in Hawaii. From October 16, 1997 to December 31, 2005, I was an Assistant Federal Public Defender in the District of Hawaii.

    2.   From on or about September, 2004, to on or about February 3, 2006, the Office of the Federal Public Defender

1



represented ABRAHAM NGUYEN MARTIN (hereinafter "Defendant") in connection with the indictment and information filed against him in the United States District Court. Prior to my taking over his representation, the Defendant was represented for a period of approximately two months by William Domingo of the Federal Public Defender's Office.

3. When I first assumed responsibility for handling the Defendant's case, he was detained in custody at the Federal Detention Center, Honolulu (FDC.) At my first meeting with Mr. Martin, I learned that he is a college graduate and an engineer. He speaks, reads and writes the English language fluently, notwithstanding English is his second language. I learned that he has a prior conviction in the U. S. District Court for the District of Hawaii for tax offenses and that he is very familiar with the American legal system and court processes and procedures in the District Court for the District of Hawaii. I also learned that Mr. Martin's wife was his co-defendant in the instant case, something he thought was very unfair. After my first meeting with him in person at FDC, the Defendant began telephoning me at the Federal Public Defender's Office on a regular basis. In fact, the Defendant began calling me at the office multiple times each day.

4. I explained to the Defendant that I could not effectively handle his case and the cases of other clients if

every client called multiple times everyday to discuss their case. I told the Defendant that consistent with my personal policy, I would answer one call from him per day, but no more, and that I was instructing the staff of the Federal Public Defender's Office to not accept more than one call a day from him.

5. In the course of my representing Mr. Martin, I reviewed several hundred pages of discovery received from the United States Attorney's Office, and I provided copies of those documents to the Defendant at FDC for him to review. I met personally with the defendant on numerous occasions at the FDC and went over the discovery with him. Based on my analysis of the evidence, it appeared that the government had a strong case against Mr. Martin and I told him so. I told him that notwithstanding my opinion, he had an absolute right to take the case to trial and make the government put on it's proof against him. I told him that if he chose to take the case to trial, I would do my best on his behalf at trial. I also told him that AUSA Shipley had advised me that if Mr. Martin took the case to trial, the government would not enter into any plea agreement with Mr. Martin's wife and she would have to go to trial too. Mr. Martin repeatedly told me that he did not want put his wife through a trial and that he himself did not want to go to trial in this case and that he wanted to bargain with the government.

I advised him that I believed that this was clearly in his best interest, given his goal of getting both he and his wife out of the case with the least possible penalty.

      6.  I evaluated the circumstances of the search of the Defendant's home by the FBI, and looked closely at the issue of what probable cause existed for the search.  I discussed the search with the Defendant, and explained that in my opinion there did not appear to be a valid legal basis to challenge the search. I evaluated whether other motions might be filed on behalf of the Defendant, but I concluded there were no pre-trial motions that would be likely yield a favorable result or that would materially advance the interests of the defense given the nature and volume of the evidence against the Defendant.  Notwithstanding, I again told Mr. Martin that if he insisted, I would file a motion to suppress the evidence that had been seized, but that a consequence of filing such a motion would be the government's withdrawal from any plea negotiations as to both Mr. Martin and his wife and that they would have to go to trial if we lost the motion to suppress.  I told him that if he went to trial and lost, he would not receive any credit for acceptance of responsibility (a possible three-level downward adjustment from his base offense level.)  I also advised him that if we were to have a hearing on any motion to suppress evidence, Mr. Martin would almost certainly have to testify.  I told him that if he

testified and the Court did not believe him, that if he were found guilty after a trial, that he would almost certainly be found to have obstructed justice and have two (2) levels added to his base offense level for sentencing, thereby enhancing his sentence. I summarized by pointing out that an unsuccessful pursuit of a motion to suppress evidence would almost certainly net him a sentence five (5) levels higher than if he were to forego the motion and enter a plea. Mr. Martin said that he didn't like it but that he understood and he reiterated that he did not want to go to trial and he wanted a plea bargain. With that understanding I redoubled my negotiations with the government on his behalf.

    7. There were two stipulated continuances of the trial date prior to the return of the Superseding Indictment. I consulted with the Defendant with respect to each of the continuances, including the need to agree to the exclusion of time under the Speedy Trial Act, and I explained to him what the Speedy Trial Act provided, and how time was excluded from the running of the 70 day period in which the case must be brought to trial. It has always been my practice to consult with my client prior to agreeing to a stipulation to continue a trial date, and I consulted with the Defendant about the need to do so in his case. The Defendant led me to believe he understood the need for and the effect of the continuances on the running of the Speedy

Trial period, and he agreed to both continuances.

8.  After the Superseding Indictment was returned by the grand jury, expanding the number of counts against the Defendant from 27 to 80, I asked the Magistrate for a short continuance of the trial date to March 22, 2005. From looking at the charges in the Superseding Indictment it was clear to me that most, if not all, were based on documentary evidence already provided in discovery, and the new indictment was merely a more comprehensive listing of the alleged crimes that were charged against the Defendant.

9.  While we were in court for Mr. Martin's arraignment on the Superseding Indictment, Mr. Martin asked me to communicate to the United States Attorney's Office his desire to plead guilty to some of the counts in the Superseding Indictment. In addition to setting a trial date on the Superseding Indictment, the parties also requested the Magistrate Judge set a hearing date for a hearing on Defendant's Motion to Withdraw Not Guilty Plea, and to Plead Anew; it was done.

10.  Prior to the Defendant entering his guilty pleas, I reviewed the Plea Agreement with him in person, and explained to him all the terms of the agreement he was making with the Government. I explained to him that by entering a guilty plea, he would be admitting each element of each charge to which he was pleading guilty. In addition, he would be waiving his right to

appeal any issue involving legal defects in the Government's investigation or prosecution of him, with only a few exceptions that would go to the Court's jurisdiction to hear the case.

11. I also explained the "Waiver of Appeal" provision in the Plea Agreement, and how it would limit his right to challenge the case against him after he pled guilty. I explained that if the Court were to sentence the defendant within the guideline range set forth in the sentencing guidelines for the offense level determined by the Court to apply to his conduct, then the Defendant would not have any right to appeal that sentence to an appellate court. The Defendant told me he understood the "Waiver of Appeal" provision.

12. When the Court sentenced the Defendant to the high end of the guideline range for the offense level which the Court determined to be applicable to the criminal conduct to which the Defendant pled guilty, it was my professional judgment that the "Waiver of Appeal" provision in the plea agreement barred any direct appeal of the sentence. On that basis, I did not advise the Defendant that he had a basis to appeal the sentence.

13. At sentencing the Government sought a four-level enhancement for "Aggravated Role in the Offense" under the Sentencing Guidelines. This enhancement was not recommended by the Probation Officer in the Draft Pre-Sentence Report, and the Government filed notice of its intention to seek such an

enhancement in its objections to the Draft Pre-Sentence Report. The Probation Officer's response to the Government's Objection rejected the request for a role enhancement, and pointed to a lack of corroborating evidence of a co-conspirator's allegation that the Defendant was a leader or organizer of the criminal activity. It was my professional judgment that the proper way to approach this question at the time of sentencing was to follow the lead of the Probation Officer, and argue against any role enhancement on the basis she had set forth in her response to the Government's Objection. I did so at the time of sentencing, however, the Court agreed with the Government's view, though it imposed only a two-level enhancement and not the four-level enhancement sought by the Government. Had the Court granted the four-level enhancement, the Defendant's sentence would have likely been 18 months longer than the 71 months imposed by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th day of June, 2007, in the District of Hawaii.

/s/ Michael A. Weight
MICHAEL A. WEIGHT